## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE<br>430 S. Capitol Street, S.E.<br>Washington, D.C. 20003<br><br>-and-<br><br>DNC SERVICES CORPORATION<br>430 S. Capitol Street, S.E.<br>Washington, D.C. 20003<br><br>Plaintiffs<br><br>v.<br><br>FEDERAL ELECTION COMMISSION<br>999 E Street, N.W.<br>Washington, D.C. 20463<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Federal Election Campaign Act of 1971 as amended 2 USC 437g(a)(8))

## PRELIMINARY STATEMENT

1.      This is an action for declaratory and injunctive relief with respect to the continuing inability and failure of defendant Federal Election Commission ("FEC") to act on an administrative complaint filed by plaintiff Democratic National Committee ("DNC").  That complaint alleged that U.S. Senator John McCain (R-Ariz.), a candidate for the nomination of the Republican Party for President of the United States, and John

McCain 2008, Inc. (the "McCain Campaign"), his principal campaign committee, have violated the Federal Election Campaign Act of 1971 as amended, 2 U.S.C. §§ 431 *et seq.* (the "FECA"), the Presidential Matching Payment Account Act, 26 U.S.C. §§ 9031 *et seq.* (the "Matching Payment Act"), and FEC regulations.

2.      In summary, as alleged in detail below, the Matching Payment Act allows a candidate for a major party nomination for President to enter into an agreement with the FEC under which the candidate will receive, from the federal government, public funds matching the first $250 of every contribution made to the candidate's campaign by an individual.  In exchange for this public grant, the candidate must agree to abide by an overall limit on the campaign's spending in seeking the nomination, as well as to abide by a number of other conditions. Senator McCain and his campaign signed a binding agreement with the FEC to accept the spending limit and the other conditions of receiving these public matching funds.

3.      Senator McCain derived concrete and substantial benefits from his agreement with the FEC.  He used the promise of receiving public funds to secure a bank loan to sustain his campaign, and he also used it to qualify for a position on several state Presidential primary ballots.

4.      Having used the FEC's certification to secure the needed private funds and for these other purposes, Senator McCain then announced that he was unilaterally abrogating his agreement with the FEC.  Since that time, Senator McCain has conducted his campaign unconstrained by any of the requirements and limitations, including limitations on primary spending, to which he bound himself under his agreement with the United States Government.  The Chairman of the FEC has already advised Senator

McCain that he is not free to withdraw unilaterally from his agreement with the FEC and to ignore the legal requirements of the Matching Payment Act, without the FEC's approval. Yet Senator McCain cannot obtain such approval, because he has already violated a key condition for dispensing with the Agreement by which he entered the matching funds program: he has pledged matching funds as collateral for a loan to his campaign.

5.    On February 25, 2008, the DNC filed an administrative complaint against Senator McCain and the McCain Campaign pursuant to the FECA, alleging that Senator McCain had violated the Matching Payment Act and the FEC's implementing regulations; and asking the FEC to (1) find reason to believe, pursuant to 2 U.S.C. § 437g(a)(2), that Senator McCain and the McCain Campaign have committed, or are about to commit, a violation of Chapter 96 of Title 26 and of the FEC rules, and to conduct an investigation; and (2) pursuant to 26 U.S.C. § 9040(c), petition the appropriate U.S. District Court for injunctive relief to implement and enforce the provisions of Chapter 96 against Senator McCain and the McCain Campaign.

6.    Ordinarily, under the FECA, any party aggrieved by the failure of the FEC to act on such a complaint during the 120-day period beginning on the date the complaint is filed, may file a petition with this Court. 2 U.S.C. § 437g(a)(8)(A). In such a proceeding, this Court may declare the failure to act to be contrary to law and may direct the FEC to conform with such declaration within 30 days. *Id.* § 437g(a)(8)(B). These timetables, however, need not be followed in extraordinary circumstances, where the pursuit of a remedy from the FEC would be futile. Those extraordinary circumstances are clearly presented here, where a candidate for President entered into an Agreement

with the United States Government, derived substantial and concrete benefits in the financing of his campaign, and then aborted that Agreement without accountability at law while the administrative agency charged with enforcing the law is unable to act.

7.      The terms of four FEC Commissioners expired in January 2008, leaving only two sitting FEC Commissioners.  The FEC does not have a quorum to take any action.  It now cannot find reason to believe to believe that Senator McCain or the McCain Campaign has broken the law – the condition precedent to investigation and conciliation.  Nor can the agency initiate a civil suit against Senator McCain or the McCain Campaign.  All of these actions require the affirmative votes of four Commissioners.  *Id.* § 437g(a)(2), (4) & (6).

8.      The violations committed by Senator McCain and the McCain Campaign before the November 2008 general election cannot be redressed unless this Court issues an order pursuant to 2 U.S.C. § 437g(a)(8), declaring that the failure to act on the DNC administrative complaint in these circumstances is contrary to law and that it is not curable by an agency wholly unable to act.

9.      Under the FECA, the effect of such an Order will be to authorize the DNC as the administrative complainant to act in the place of the FEC in seeking from this Court a declaration that the law has been violated and a remedial order establishing any and all appropriate penalties. 2 U.S.C. §437g(a)(8)(C).

## PARTIES

10.     Plaintiff DEMOCRATIC NATIONAL COMMITTEE  is an unincorporated association, with its principal place of business in Washington, D.C.  The Democratic National Committee is the governing body of the Democratic Party of the

United States. The organizational purposes and functions of the Democratic National Committee are to persuade and organize citizens to register to vote as Democrats and to cast their votes for Democratic Party nominees and candidates; to communicate the Democratic Party's position and messages on issues; and to aid and encourage the election of Democratic candidates at the national, state and local levels. A principal purpose of the DNC in presidential election years is to promote the election of the Democratic nominee for President and to oppose the election of the Republican nominee.

10.    Plaintiff DNC SERVICES CORPORATION, a District of Columbia non-profit corporation that is controlled by the elected national officers of the Democratic National Committee, owns the assets, employs the staff and possesses the contractual rights and obligations of the Democratic National Committee. The Democratic National Committee undertakes most of its business and financial activities through DNC Services Corporation.

10.    Democratic National Committee and DNC Services Corporation are jointly registered with the Federal Election Commission ("FEC") as a "national committee" within the meaning of the FECA, 2 U.S.C. § 431(14) and the FEC's regulations, 11 C.F.R. § 100.13. Contributions made to the Democratic National Committee of any kind are legally treated as contributions to this federal political committee. All contributions to the DNC are publicly reported and disclosed on reports filed regularly with the FEC under FECA, 2 U.S.C. § 434. Plaintiffs Democratic National Committee and DNC Services Corporation are hereinafter collectively referred to as the "DNC".

11.    Defendant FEDERAL ELECTION COMMISSION ("FEC") is the agency designated by FECA to enforce the provisions of FECA, 2 U.S.C. § 437c(b).  Except as provided under 2 U.S.C. § 437g(a)(8), the FEC has exclusive jurisdiction with respect to the civil enforcement of FECA.  2 U.S.C. § 437c(b)(1).

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 2201 and 2202 and under FECA, 2 U.S.C. § 437g(a)(8).

14.    Venue is proper in this Court pursuant to FECA, 2 U.S.C. § 437g(a)(8)(A).

## STANDING

15.    A principal role of the DNC in presidential election years is to oppose the election of the Republican nominee for President.

16.    Senator McCain is the presumptive nominee of the Republican Party for President, having won, through Republican primaries and caucuses, a majority of the delegates to the Republican National Convention.

17.    Under the FECA, the DNC may receive contributions only from individuals, up to $28,500 per calendar year, and from federal political committees, up to $15,000 per calendar year.

18.    The DNC may lawfully expend its funds on communications and voter contact activities advocating the defeat of the Republican presidential nominee, as long as such expenditures are made independently of any candidate for the Democratic nomination or, once there is a presumptive or actual nominee, made independently of that nominee. 11 C.F.R. §§ 109.30.  For example, in 2004, the DNC expended substantial sums on television advertising, mailings and phone calls supporting the election of

Senator John Kerry, its then-nominee for President and/or opposing the re-election of President George W. Bush, the Republican nominee.

19.   The DNC may also expend up to a specified dollar amount in connection with the general election campaign, including communications opposing the presumptive Republican nominee, in coordination with the Democratic candidate(s) for President.  2 U.S.C. § 441a(d)(2);  11 C.F.R. §§ 109.30, 109.32, 109.34.

20.   The DNC may also expend its funds on organizing and recruiting supporters and volunteers, providing support for state Democratic Party offices and staff to be used for voter contact operations, to pay for supervision and organization of volunteers engaged in certain voter contact operations, and other activities in support of the Democratic ticket and in opposition to Republican candidates.

21.   All other factors being equal, the more money the Republican nominee is able to spend on his campaign, the more funds the DNC must raise and spend in order to compete effectively.

22.   The DNC's role in raising and spending funds to oppose the election of Senator McCain is especially important in the current period, between now and the emergence of a presumptive nominee, because the contest for the Democratic nomination is continuing and the candidates for the nomination are expending most of their resources in the campaign to secure the nomination rather than on communications and activities to oppose the election of the presumptive Republican nominee, Senator McCain.

23.   The continuing inability and failure of the FEC to act against the violations committed by Senator McCain and the McCain Campaign is allowing them to continue to violate the law.

24.    The FECA specifically provides that when the FEC's failure to act is contrary to law, and the FEC is unable to conform its actions to law within thirty days by order of a Court, the public interest in enforcement of the law is protected by authorizing an administrative complainant to act in place of the agency. 2 U.S.C. §437g(a)(8)(C). The DNC, as administrative complainant, is prepared to bring and will bring an action directly to remedy the violation described in the DNC's administrative complaint, if the Court grants the relief the DNC seeks.

25.    The violations committed by Senator McCain have forced the DNC and its supported candidates to compete in a presidential election cycle that is tainted by illegal practices. Senator McCain is the presumptive Republican nominee, and his illegal conduct—and the inability of the FEC to enforce the law – affects the competitive positions of the DNC and the Democratic candidates for President. *Inter alia,* his violations are compelling, and will continue to compel the DNC to raise and expend amounts it would not otherwise not be required to expend in order to oppose the election of Senator McCain as President.

26.    The DNC has thus suffered and continues to suffer injury in fact as a direct result of the FEC's failure to act on the DNC's administrative complaint.

## STATUTORY AND REGULATORY BACKGROUND

27.    Under the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001 *et seq.*, the Secretary of the Treasury has established and maintains a separate account, the Presidential Election Campaign Fund, into which are deposited an amount of government funds equal to the total amount designated by individual taxpayers on their income tax

returns to be used for certain public financing of presidential campaigns. 26 U.S.C. §§ 6096, 9006(a).

28.    Pursuant to the Matching Payment Act, 26 U.S.C. § 9031 *et seq.*, the Secretary of the Treasury maintains a sub-account of the Presidential Election Campaign Fund to be used to provide certain public funds which a candidate for the nomination of a major party for President of the U.S. may, under certain conditions, elect to receive and use to support that candidate's campaign for the nomination. 26 U.S.C. § 9037. Specifically, such a candidate may become eligible to receive what are popularly known as "matching funds," which are payments from that sub-account equal to the total amount of contributions received from individual contributors to the campaign, disregarding the amount of each contribution over $250. *Id.* § 9034(a). In other words, a participating candidate can receive public funds matching the first $250 of every contribution received from an individual donor.

29.    In order to become eligible to receive these "matching funds," however, the candidate must agree to a number of conditions, set forth in 26 U.S.C. §§ 9033(a) & (b) and in the FEC's rules, 11 C.F.R. §§ 9033.1, 9033.2. One of the key conditions is that the candidate agree not to expend more than a specified dollar amount on his campaign for the nomination, during the period beginning on the day the candidate announces he is running for President until the date the candidate either quits the race or receives the nomination at the party's National Convention. *Id.* § 9035; 11 C.F.R. §§ 9032.6(a), 9035.1.

30.    A candidate seeking to become eligible for matching fund payments must agree, in a letter signed by the candidate directed to the FEC, that the candidate will

comply with all the conditions set forth in the FEC's regulations, including keeping certain records and agreeing to an audit, 11 C.F.R. § 9033.1. The candidate must also submit a separate written statement certifying that the candidate and his campaign will not exceed the spending limit; and that the campaign has received initial contributions sufficient to meet certain threshold requirements (matchable contributions totaling more than $5,000 in each of at least 20 States), together with documentation of those initial matchable contributions. *Id.* § 9033.2(b).

31.    The FEC then examines these submissions and makes a determination that the candidate has either met or has not met the threshold requirements, and then notifies the candidate of that initial determination. *Id.* § 9033.4(a).

32.    The spending limit to which a participating Republican candidate must agree covers all expenditures by that candidate from the date that the candidate became a candidate until the date of his nomination by the Republican Party of its candidate for President at the Republican National Convention in September 2008. 11 C.F.R. § 9032.6(a).

33.    The spending limit for the primary elections for President for those who agree to participate in the matching funds program was originally set by statute at $10,000,000. 2 U.S.C. § 441a(b)(A). This amount is indexed for inflation. The limit for the 2008 election cycle is $42,050,000. In addition to this base limit, the FEC has provided an additional 20% increase to the spending limit for fundraising costs (11 C.F.R. § 100.152), and an additional 15% increase for legal and compliance costs (11 C.F.R. § 9035.1(c)). Therefore, on information and belief, the applicable spending limit for participating candidates in 2008 is $56,757,500.

**FACTUAL BACKGROUND**

34.    On August 13, 2007, Senator McCain submitted his signed Candidate Agreement and Certification to the FEC, seeking certification of eligibility to receive matching funds under the Matching Payment Act.  In that Candidate Agreement and Certification letter, Senator McCain agreed to all of the provisions set forth in the FEC's rules, 11 C.F.R. §§ 9033.1 and 9033.2, including an express agreement that his campaign would not exceed the applicable spending limit.  Senator McCain sought to enter the public funding system when it served his purposes, giving his campaign vitally needed access to funding.

35.    On December 20, 2007, the FEC announced that it had certified Senator McCain to receive federal matching funds.  As the FEC explained in the release, to "become eligible for matching funds, candidates must raise a threshold amount" and "[o]ther requirements to be declared eligible include agreeing to an overall spending limit of approximately $50 million, abiding by spending limits in each state, using public funds only for legitimate campaign-related expenses, keeping financial records and permitting an extensive campaign audit."  Senator McCain agreed to all of these conditions in his Candidate Agreement letter.

36.    On information and belief, Senator McCain and the McCain Campaign used the fact that the FEC had found him eligible to receive matching funds to obtain ballot access in several states.  The applicable law in these states provided relaxed conditions for ballot access to those candidates whom the FEC had found to be eligible for public funds.

37.    On January 31, 2008, the McCain Campaign filed, with its year-end report, a Schedule C-1, disclosing that the Campaign had obtained a $4,000,000 line of credit from Fidelity & Trust Bank (the "Bank"), and had drawn $2,971,697 of that line of credit. The loan documents consisted of a Business Loan Agreement, dated as of Nov. 14, 2007 (the "Loan Agreement"); a Commercial Security Agreement dated as of Nov. 14, 2007, between the Campaign and the Bank (the "Security Agreement"); a Promissory Note in the principal amount of $3 million, made by the Campaign to the Bank (the "Note"); and a Loan Modification Agreement dated Dec. 17, 2007 (the "Modification Agreement").

38.    On February 6, 2008, Senator McCain sent a letter to the FEC announcing that he and his campaign were withdrawing from participation in the federal primary-election funding program established by the Matching Payment Act.  On February 7, 2008, counsel for the McCain Campaign sent a letter to the U.S. Treasury announcing that the Senator and his campaign were withdrawing from the program.

39.    On February 19, 2008, FEC Chairman David Mason sent a letter to Senator McCain advising him that the FEC considers Senator McCain's February 6, 2008 letter "as a request that the FEC withdraw its previous certifications" and that just as the law "required an affirmative vote of four [FEC] Commissioners to make these certifications, it requires an affirmative vote of four [FEC] Commissioners to withdraw them."

## VIOLATIONS OF MATCHING PAYMENT ACT BY SENATOR MCCAIN AND THE MCCAIN CAMPAIGN

40.    The FEC's rules, 11 C.F.R. § 9033.1, require a candidate seeking to become eligible to receive primary matching fund payments "to agree in a letter signed by the candidate to the FEC" that the candidate and the candidate's campaign will comply with

the legal conditions set out in that regulation.  As set forth in paragraph 34 above, Senator McCain signed and submitted such a letter and the required certification.

41.    In Advisory Opinion 2003-35, the FEC ruled that, once accepted by the FEC through certification of the candidate's eligibility for matching funds, such a letter constitutes "a binding contract with the FEC," *id*. at 2, and that any request for withdraw from the matching funds program will be treated as a request, "in effect, [as to] whether the FEC would consent to a rescission of this contract." *Id*.

42.    In that Advisory Opinion, the FEC held that as a matter of policy, the FEC would grant such consent "to withdraw a certification of a candidate's eligibility to receive Matching Payment Act funds prior to the payment date for any such funds to such candidate or his or her committee upon receipt of a written request signed by the candidate, *provided that the certification of funds has not been pledged as security for private financing*." *Id*. at 4 (emphasis added).

43.    In the case of Senator McCain,  the FEC has not granted any consent to the Senator or the McCain Campaign to rescind the Senator's "binding contract with the FEC" A.O. 2003-35 at 2.  Therefore, Senator McCain and the McCain Campaign are still bound by that Candidate Agreement and Certification letter, and are not free to withdraw unilaterally from the matching funds program, to ignore their legal obligations under the Candidate Agreement and Certification letter, or escape all consequences for the decision made unilaterally to abrogate that Agreement.

44.    The required disclosure form filed by the Campaign with the FEC, Schedule C-1, indicated that the collateral pledged for the loan excludes "certification for federal matching funds" and "public financing."  The Loan Agreement  also represents that "any

certification of matching funds eligibility currently possessed by [the Campaign] or obtained before January 1, 2008 and the right of" Senator McCain and the Campaign "to receive payment under these certifications are not collateral" for the loan.

45.    In fact, however, the Campaign did effectively pledge future matching funds to be received under the initial certification as collateral for the loan, in several ways.

46.    In the Loan Agreement, under "Affirmative Covenants," a provision entitled "Additional Requirements" provides that if the McCain Campaign withdraws from the matching funds program before the end of 2007 but Senator McCain does not win the New Hampshire primary or place within 10 points of the winner, Senator McCain will continue his candidacy, reapply for public matching funds and grant to the Bank, "as additional collateral for the Loan, a first priority perfected security interest in and to" all of the Campaign's "right, title and interest to the matching fund program." Taken in combination with the fact that Senator McCain and the Campaign had already applied for and received the certification for matching funds, this provision can only be interpreted as a *present* encumbrance, however conditional, of the Campaign's *future* interest in and entitlement to matching funds, as part of the security for the line of credit.

47.    Further, a negative covenant, appears under "Negative Covenants," on page 3 of the Loan Agreement, under the subheading "Indebtedness and Liens." In that section, the Campaign agrees that it will not, without the Bank's consent, "transfer, mortgage, assign, pledge, lease, grant a security interest in or encumber" any of the Campaign's "assets, including without limitation any of Borrower's right, title or interest in and to the public matching fund program or any matching fund entitlement thereunder, whether now existing or hereafter arising...." This negative covenant clearly implies

that the Bank assumes it has a perfected security interest in all future rights of the

Campaign to receive matching funds under the initial determination of eligibility.

48.    The Loan Agreement also includes a provision, on page 4, entitled

"Compliance with the Federal Election FEC's Matching Funds Program," in which the

Campaign agrees with the Bank that, while the Loan Agreement is in effect, the

Campaign "shall not exceed overall or state spending limits set forth in the Federal

Matching Funds program, if applicable." The only reason for inclusion of such a

provision would be to ensure that the Campaign will continue to be entitled to receive

matching funds so that the Bank can treat them as part of the Collateral.

49.    The Modification Agreement, made on December 17, 2007, before Senator

McCain and the McCain Campaign purported to withdraw from the matching funds

program, amends that provision to make it applicable "irrespective of whether Borrower

[the Campaign] is subject to such program as of any applicable date of determination."

Thus, the Bank obtained a covenant from the Campaign to abide by the spending cap

while the Loan Agreement is in effect regardless of whether or not the Campaign

considered itself to be participating in the matching funds program. Again, the only

conceivable purpose and effect of such a covenant would be to ensure that matching

funds could be received and be available as collateral for the loan.

50.    The Security Agreement , on page 1 under the provision entitled "Collateral

Description," describes the collateral being pledged for the line of credit as including,

generally, all "accounts, . . . deposit accounts, money, other rights to payment and

performance . . . ." The next to last sentence of this description states that, "any

certification of matching fund eligibility, including related rights, *currently possessed* by

Grantor [the Campaign] *or obtained before January 1, 2008*, are not themselves being

pledged as security. . . and are not themselves collateral for the indebtedness…"

(emphasis added).

    51.   The description of the collateral for the loan thus does not exclude but rather

*includes*—as of the date of the Security Agreement—rights to receive matching funds

that arise, *i.e.*, that come into existence, after January 1, 2008, based on matchable

contributions received and presentations in good order made after that date, even without

any new certification of initial eligibility under section 9033.4 of the FEC's rules.  Again,

then, under this language, the Campaign has made a current pledge and encumbrance of

*future rights* to receive funds under the matching funds program under and pursuant to

the *initial certification* of matching payment eligibility made by the FEC in December

2007.

    52.   Again a negative covenant appearing at the end of the Collateral

Description, which provides that the Campaign "agrees not to sell, transfer, convey,

pledge, hypothecate or otherwise transfer to any person or entity any of its present or

future right, title and interest in and to the public matching fund program,….including

related rights," without the Bank's consent. It makes no sense for the Security Agreement

to include such a negative covenant unless it was intended that the Campaign is, in the

Agreement, making a current pledge of future rights to receive matching funds.

    53.   Further, the Modification Agreement, made on December 14, 2007, changed

the language of the exemption in the Collateral Description to exclude, from the

Collateral, only those "certifications of matching funds eligibility, including related

rights, *now held by* Grantor. . . ," in place of "currently possessed by Grantor or obtained

before January 1, 2008." This modification makes clear again that, although the initial *amount* certified in December 2007 may not be part of the Collateral, the Collateral *will* include *future* amounts of matching funds paid, based on *future* submissions, even though based on the initial certification of eligibility.

54.    For these reasons, the McCain Campaign and Senator McCain pledged the certification of matching funds as security for private financing. Assuming the FEC treated the letter from Senator McCain as a request for withdraw from the program, the FEC, consistent with its own rules and precedent, would be required to deny that request.

55.    But Senator McCain and the McCain Campaign have announced that they will disregard the Agreement; that they will disregard the February 2008 letter received from the Chairman of the FEC who advised Senator McCain that he remained bound by his Agreement; and that they will proceed as if free to withdraw unilaterally and without consequences from the Agreement.

56.    On March 20, 2008, the McCain Campaign filed with the FEC its required March Monthly disclosure report covering the period from February 1, 2008 through February 29, 2008. That report disclosed that Senator McCain's campaign has, as of February 29, 2008, in fact, exceeded the $56,757,500 spending limit. As of February 29, 2008, Senator McCain has disclosed spending $56,916,682 in connection with his campaign for the Republican Presidential nomination. Senator McCain and his campaign are spending without regard to the limitations to which they bound themselves in the Candidate Agreement and Certification executed by them and submitted to the FEC.

57.    In addition, on information and belief, the McCain Campaign has continued to expend funds since February 29, 2008, and will continue to expend such funds, thereby continuing to violate the FECA and the Matching Payment Act.

58.    Thus, Senator McCain and the McCain Campaign have violated the FECA, 2 U.S.C. § 431 *et seq.,* the Matching Payment Act, 26 U.S.C. § 9035, and the FEC's rules.

## THE DNC'S ADMINISTRATIVE COMPLAINT

59.    On February 25, 2008, the DNC filed an administrative complaint (the "DNC Administrative Complaint") against Senator McCain and the McCain Campaign pursuant to the FECA, 2 U.S.C. § 437g(a)(1), alleging that Senator McCain had violated the Matching Payment Act and the FEC's implementing regulations; and asking the FEC to (1) find reason to believe, pursuant to 2 U.S.C. § 437g(a)(2), that Senator McCain and the McCain Campaign have committed, or are about to commit, a violation of Chapter 96 of Title 26, United States Code, and of the FEC regulations, and to conduct an investigation; and (2) pursuant to 26 U.S.C. § 9040(c), petition the appropriate U.S. District Court for injunctive relief to implement and enforce the provisions of Chapter 96 against Senator McCain and the McCain Campaign.    Ordinarily, under the FECA, any party aggrieved by the failure of the FEC to act on such a complaint during the 120-day period beginning on the date the complaint is filed, may file a petition with this Court.  2 U.S.C. § 437g(a)(8)(A).  In such a proceeding, this Court may declare the failure to act to be contrary to law and may direct the FEC to conform with such declaration within 30 days.  *Id.* § 437g(a)(8)(B).  In the event of the FEC's failure to conform its actions to the Court's order within 30 days,  the "the complainant may bring, in the name of such

complainant, a civil action to remedy the violation involved in the original complaint. *Id.* § 437g(a)(8)(C).

60.   In this case, the FEC will not be able to act on the DNC Administrative Complaint because there are an insufficient number of sitting Commissioners to vote upon the question of whether there is reason to believe that Senator McCain and the McCain Campaign have committed a violation of the Matching Payment Act. The decision even to commence an investigation of such a complaint requires the affirmative votes of four of the six FEC Commissioners. *Id.* § 437g(a)(2).

61.   There are only two sitting Commissioners because the terms of the other FEC Commissioners have expired and no replacements have been confirmed by the U.S. Senate. Therefore, under 2 U.S.C. § 437g(a), the FEC cannot act to remedy Senator McCain and the McCain Campaign's violations, including the initiation of a civil action before this Court to seek declaratory relief and monetary penalties.

62.   The FEC's inability to act on the DNC Administrative Complaint will continue for the foreseeable future. The Senate Minority (Republican) Leader has refused to consent to up or down votes on four individuals, each of whom has been duly nominated by the President for the position of Commissioner of the FEC. The Republican Leader has made it clear that the Senate Republican Conference will block these nominations.

## <u>COUNT ONE</u>

63.   The allegations of paragraphs 1-62 above inclusive are hereby repeated and re-alleged as though fully set forth.

64.   The FEC has failed to act on the DNC Administrative Complaint to date.

65.    For the reasons specified in paragraphs 60-62, it is futile for the plaintiffs to await the expiration of the 120-period specified in 2 U.S.C. § 437g(a)(8), or the 30 day "cure" period provided for in 2 U.S.C. § 437g(a)(8) (C).  The FEC cannot act or cure its failure to act in these extraordinary circumstances.

66.    The FEC's failures to act or to cure the failure to act on the DNC Administrative Complaint is contrary to law because the DNC Administrative Complaint sets forth factual allegations which, if true, would clearly establish reason to believe, within the meaning of 2 U.S.C. § 437g(a)(2), that Senator McCain and the McCain Campaign have violated the Matching Payment Act.

67.    Plaintiffs have no adequate remedy at law, unless the Court issues an Order by which, as provided by statute, the DNC can seek by separate action, in its own name,. a declaration of law and the imposition of appropriate penalties.

68.    Without the relief requested in this action, the law will go unenforced, in direct contravention of the Congressional design by which, if the FEC cannot act, administrative complainants can seek the enforcement from this Court that is unavailable through the administrative process.

69.    The benefits that Senator McCain will achieve at the expense of the Democratic Party, the DNC and their supported candidates, by expending funds in violation of the Matching Payment Act, and the resulting harm to the DNC, is irreparable in that it cannot be remedied in the future through any other legal processes.

70.    Moreover, the process of determining whether the DNC complaint presents a violation of the Act or the Matching Payment Act is – or should be – a straightforward one.  Whether Senator McCain and the McCain Campaign were indeed able to withdraw

from the public financing system, as they purport, is a question of law that a court can decide in the absence of a functioning administrative agency. It would be well within the authority of a court to set reasonable limits on the development and evaluation of a record.

**RELIEF REQUESTED**

WHEREFORE, plaintiffs respectfully pray that this Court: :

1.      Enter an order declaring that the FEC's failure to act upon the DNC Administrative Complaint is contrary to law under and within the meaning of the FECA, 2 U.S.C. § 437g(a)(8)(C);

2.      Pursuant to 2 U.S.C. § 437g(a)(8)(C), enter an order finding that it would be futile to direct the FEC to conform with such declaration within thirty (30) days; and authorizing the DNC to bring a civil action to remedy the violations involved in the original complaint;

3.      Grant plaintiffs the costs and expenses of this action; and

4.      Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Joseph E. Sandler
(D.C. Bar #255919)
John Hardin Young
(D.C. Bar #  190553)
SANDLER, REIFF & YOUNG, P.C.
300 M Street, S.E.  # 1102
Washington, D.C. 20003
Tel: (202) 479-1111
Fax: (202) 479-1115
e-mail: sandler@sandlerreiff.com


Amanda S. LaForge
(D.C. Bar # 491909)
Chief Counsel
Democratic National Committee
430 S. Capitol Street, S.E.
Washington, D.C. 20003
Tel: (202) 479-5153
Fax: (202) 479-5149
Email: laforgea@dnc.org

Attorneys for Plaintiffs

Dated: April 14, 2008

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

## I. (a) PLAINTIFFS

Democratic National Committee and DNC Services Corporation                110 01

**DEFENDANTS**

Federal Election Commission

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF        11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Joseph E. Sandler  Sandler Reiff & Young, P.Cc
300 M Street, S.E. #1102
Washington, D.C. 20003
Tel: (202) 479-1111

Case: 1:08-cv-00639
Assigned To : Bates, John D.
Assign. Date : 4/14/2008
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

⊙ 2 U.S. Government
Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)  **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☒ **C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**        OR        ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act)

③

| O **G. Habeas Corpus/ 2255** | O **H. Employment Discrimination** | O **I. FOIA/PRIVACY ACT** | O **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** ☐ **890 Other Statutory Actions** (if Privacy Act) *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** ☐ **720 Labor/Mgmt. Relations** ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** ☐ **740 Labor Railway Act** ☐ **790 Other Labor Litigation** ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** ☐ **443 Housing/Accommodations** ☐ **444 Welfare** ☐ **440 Other Civil Rights** ☐ **445 American w/Disabilities-Employment** ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** ☐ **120 Marine** ☐ **130 Miller Act** ☐ **140 Negotiable Instrument** ☐ **150 Recovery of Overpayment & Enforcement of Judgment** ☐ **153 Recovery of Overpayment of Veteran's Benefits** ☐ **160 Stockholder's Suits** ☐ **190 Other Contracts** ☐ **195 Contract Product Liability** ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  O 2 Removed from State Court  O 3 Remanded from Appellate Court  O 4 Reinstated or Reopened  O 5 Transferred from another district (specify)  O 6 Multi district Litigation  O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

2 USC 437g(a)(8) Petition challenging failure of Federal Election Commission to act on administrative complaint

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** ⌐ ⌐ ⌐ ⌐ ⌐ Check YES only if demanded in complaint **JURY DEMAND:**    YES ☐    NO ☒ |
|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

**DATE** 3/14/08    **SIGNATURE OF ATTORNEY OF RECORD**

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

